ROBERTSON, Justice,
for the Court:
I.
This is a hospital licensing dispute. The case began as a contest over which of two for-profit corporations would fill a fifty-eight bed need in children’s and adolescent psychiatric care in the Rankin County/Greater Jackson area. Once state administrators awarded a certificate of need to one, the loser switched strategies and now vigorously asserts lack of need. En route we encounter a cute question of choice of (statutory) law in time. In the end, we reverse the Chancery Court and reinstate the administrative agency’s decision.
II.
A.
First, the cast of characters:
■ Grant Center Hospital of Mississippi, Inc. (hereinafter “Grant Center”) is a for-profit corporation organized, chartered and existing by virtue of the laws of Mississippi. Grant Center is a wholly owned subsidiary of Hospital Corporation of America, which is one of the nation’s largest health care providers.
Health Group of Jackson, Mississippi, Inc., is a Tennessee corporation which for years has operated a private psychiatric hospital in the Greater Jackson/Rankin County area using the trade name Riverside Hospital (and thus is hereinafter referred to as “Riverside”). Riverside is in turn owned by Health Group, Inc., another Tennessee corporation.
The Mississippi Health Care Commission was created by legislative enactment, to be specific, the Mississippi Health Care Commission Law of 1979, Miss.Code Ann. *806 §§ 41-7-171, et seq. (1981). Effective July 1, 1986, the powers and functions of the Commission were transferred to the State Department of Health under the Mississippi Health Services Reorganization Act of 1986. See Miss.Laws, ch. 437, § 35, p. 412 (1986). For purposes of convenience, throughout this opinion the term “Commission” will be used to refer to both the Commission and its successor, the Department of Health.
B.
The case began and continues over Grant Center’s efforts to establish a children’s and adolescent psychiatric care hospital in the Greater Jackson/Rankin County area and Riverside’s efforts to keep them from it. But, first, a bit more background.
Mississippi’s scheme of health-care regulation was adopted pursuant to a now-repealed federal statute, the National Health Planning and Resources Development Act (NHPRDA), 42 U.S.C. § 300k et seq. This act once required that each state establish a Statewide Health Coordinating Council. The Council was to be responsible for preparing a state health plan, which should state the extent to which new health care facilities needed to be constructed or acquired. 42 U.S.C. § 300m-3(c)(2)(A). The state was to review its health plan at least triennially and revise it as necessary.
The Act also required each state to administer a Certificate Of Need (CON) program. 42 U.S.C. § 300m-2(a)(4)(B). As a general matter health care facilities could not be constructed, new health services added, or major health care capital expenditures incurred without prior approval by the designated state agency through the issuance of a certificate of need. The CON procedure was conceived as “ ‘the basic component in an overall effort to control the unnecessary capital expenditures which contribute so greatly to the total national health bill.’ ” National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City, 452 U.S. 378, 385-86, 101 S.Ct. 2415, 2420, 69 L.Ed.2d 89, 97 (1981) (quoting S.Rep. No. 96-96, at 5 (1979)).
To comply with the federal act as it once existed the Mississippi legislature enacted the Mississippi Health Care Commission Law of 1979, Miss.Code Ann. § 41-7-171 et seq. This law created the Commission and empowered it to implement the CON regulatory process. Miss.Code Ann. § 41-7-193 established the standards for issuance of CONs for new institutional health services and other projects.
Initially, state law did not incorporate the federal requirement that decisions to issue CONs comply with the current state health plan. On April 9, 1983, however, the following language was added to subsection (1) of the statute:
A certificate of need shall not be granted or issued to any person for any proposal, cause or reason, unless the proposal has been reviewed for consistency with the specifications and the criteria established by the commission and substantially complies with the projection of need as reported in the most current state health plan.
Miss.Code Ann. § 41-7-193(1) (Supp.1983); see Miss.Laws, ch. 484, § 6, p. 508 (1983).
This is the state of the law at the point when today’s litigants begin contesting for a CON to provide an adolescent and child psychiatric hospital in the Rankin County/Greater Jackson area. Intriguing questions are added to this appeal by virtue of the fact that both state and federal legislatures have enacted further since that time and during the course of this litigation.
More modestly, the Mississippi legislature amended Section 41-7-193(1), effective July 1, 1985, so that the phrase “most current state health plan” has been replaced with the phrase “the state health plan in effect when the application was submitted.” See Miss.Laws ch. 534, § 9 (1985).
The Congress has been more bold. The federal law that started it all has been relegated to the junk heap. ' The Omnibus Health Bill (Senate Bill 1744) which became effective on November 14, 1986, repealed the Federal Health Planning Program. As we write, there are no federal requirements *807 governing certificate of need activities by the state.
C.
Riverside has long been the exclusive provider of private psychiatric care in the Greater Jackson/Rankin County area. In August of 1982, the Commission issued to Riverside a CON for a thirty bed adolescent program. This left unfilled a 58-bed need under the then current state health plan.
September 1, 1982, touched off the controversy that still rages almost six years and many hours/dollars later. On that date Grant Center filed with the Commission an application for a CON to construct a sixty bed, free-standing psychiatric hospital for children and adolescents to be located in Rankin County. Grant Center’s application was deemed completed on October 4, 1982.
Riverside quickly responded. On December 9, 1982, it filed an application for a CON to provide 56 additional beds. The Riverside application was not deemed complete until early February 1983 and was not considered in the same review cycle as Grant Center’s proposal.
On January 20, 1983, the Commission reviewed the Grant Center application. Riverside appeared in opposition. After hearing testimony and commentary, the Commission issued its Notice of Intent to give Grant Center a CON to construct a 58-bed psychiatric hospital for children and adolescents. After the Commission denied Riverside’s request for a reconsideration hearing, Grant Center received its CON for 58 beds by final order of the Commission dated March 17, 1983.
This was only the beginning, as Riverside appealed that order to the Chancery Court of the First Judicial District of Hinds County. Miss.Code Ann. § 41-7-201(1) (Supp.1984). On April 4, 1983, the Chancery Court set aside the Commission’s order and remanded the matter to the Commission for a comparative hearing on the respective applications of Grant Center and Riverside. That Court held that, while the Commission may have been procedurally correct in refusing to consider the Riverside proposal as a competing application, the “Commission would have best served the public interests by granting a comparative hearing on the two applications.”
Before the comparative hearing on remand, the plot thickened considerably. The 1984 State Health Plan went into effect, subdividing the service area both Grant Center and Riverside contemplated in their pending CON applications. The 1984 Plan indicated that a new service area was added. This area, “F”, is made up of the ten southernmost counties that were formerly part of the seventeen county “C” service area.[1]
At the hearing held October 17,1984, the Commission announced it would proceed under the 1982 plan. The Commission then conducted an extensive comparative review of the respective proposals of Grant Center *808 and Riverside. During the course of four days of hearing and consideration, Grant Center, Riverside and interested members of the public submitted over 1,200 pages of testimony and introduced over 100 exhibits and other evidence to demonstrate the alleged advantages and disadvantages of each facility.
On March 21, 1985, the Commission once again awarded a CON to Grant Center. After the Commission denied its petition for rehearing, Riverside again appealed to the Chancery Court.
And, again, Riverside was successful. On May 28, 1985, the Chancery Court entered an Order vacating and setting aside the findings and order of the Commission. The sole basis for the Court’s decision was its determination that the Commission should have used the 1984 State Health Plan instead of the 1982 Plan. Accordingly, the Chancery Court vacated and set aside the Final Order of the Commission and remanded the cause to the Commission for yet another hearing.
Grant Center now appeals to this Court.
III.
First, a word about our scope of review. The legislature has directed that an order of the Commission regarding a certificate of need is subject to judicial review but
shall not be vacated or set aside, either in whole or in part, except for errors of law, unless the court finds that the order ... is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the ... [Commission], or violates any vested constitutional rights of any party involved in the appeal.
Miss.Code Ann. § 41-7-201(4) (Supp.1987). This, of course, is nothing more than a statutory restatement of familiar limitations upon the scope of judicial review of administrative agency decisions. See, e.g., Harris v. Mississippi Real Estate Commission, 500 So.2d 958, 962 (Miss.1986); Eidt v. City of Natchez, 421 So.2d 1225, 1231-32 (Miss.1982); Mainstream Savings & Loan Association v. Washington Federal Savings & Loan Association, 325 So.2d 902, 903 (Miss.1976); Mississippi State Tax Commission v. Mississippi-Alabama State Fair, 222 So.2d 664, 665 (Miss.1969).
These restrictions put two hotly disputed points outside our authority. These are (1) whether there is a need for additional beds for psychiatric care of children and adolescents and (2) which applicant, all things considered, is best able to fulfill that need — Grant Center or Riverside.
By way of contrast, where an administrative agency errs as a matter of law, courts of competent jurisdiction should not hesitate to intervene. To be sure, the construction placed upon a statute by the agency charged with its administration and implementation is entitled to weight. General Motors Corp. v. State Tax Commission, 510 So.2d 498, 502 (Miss.1987); Gully v. Jackson International Co., 165 Miss. 103, 145 So. 905, 907 (1933); see also Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801-02, 23 L.Ed.2d 371, 383-84 (1969). Notwithstanding, this Court will not defer to an agency’s interpretation of the statute when that interpretation is repugnant to the best reading thereof. See Mississippi State Tax Commission v. Dyer Investment Co., Inc., 507 So.2d 1287, 1289 (Miss.1987); Universal Manufacturing Corp. v. Brady, 320 So.2d 784, 786 (Miss.1975).
IV.
In a very real sense, the Chancery Court decision here under review respected the principles just stated. That Court held that, as a matter of law, the Commission erred when it considered Grant Center’s application under the 1982 state plan instead of the 1984 state plan.
To be sure, the 1982 state plan was the one in effect on September 1, 1982, when Grant Center submitted its original application. By the time of the administrative hearing at issue, however, that plan had been superseded by the 1984 plan which, on its face, contained substantial changes. The question of law became, under which *809 state plan would the CON applications be considered — 1982 or 1984? That matter is controlled by statute, and at the time Miss. Code Ann. § 41-7-193 required consideration under “the most current state health plan.” [Emphasis supplied]
The Court below held that the statute required consideration of the CON applications under the 1984 plan, notwithstanding that this plan had no existence in 1982 when the applications were prepared and submitted.[2] That Court held that the Commission erred in its use of the 1982 plan and remanded to the Commission with directions to both applicants to resubmit their applications to comply with the most current health plan.
On appeal the parties have engaged in extensive and quite unhelpful debate whether the phrase “the most current state health plan” is ambiguous or unambiguous. They forget that ambiguity, like beauty, is in the eye of the beholder.
When all of the sound and fury has subsided, this case turns on the meaning of Section 41-7-193(1) at the time of the Commission hearing held October 17, 1984. The critical language in the statute at that time is “the most current state health plan”; that is, the statute directed that the Commission not grant a CON unless the proposal therefor substantially complied with the projection of need as reported in “the most current state health plan.”
Grant Center argues that this phrase must necessarily mean the most current state health plan in effect at the time the proposal is submitted or else delays in the administrative process would mire applicants in a kafkaesque struggle to reach an ever receding castle — this particularly where there is opposition and judicial review and where state plans are revised more frequently than applications may be processed. We are told the legislature recognized this dilemma when, twenty-eight months after enactment of “the most current state health plan” language, the wording was changed and “clarified” in 1985 to “the state health plan in effect at the time the application for the proposal was submitted.” Miss.Laws ch. 534, § 9 (1985). This 1985 legislative action has generated argument by the parties respecting the power of an amendment to a statute to change the law retroactively. The argument is quite wide of the mark.
The 1985 language was not law on October 17, 1984, and simply may not be regarded as an authoritative legislative determination of the meaning of the pre-amendment statute. General Motors Corp. v. State Tax Commission, 510 So.2d 498, 502 (Miss.1987). On the other hand, the 1985 enactment is available as an aid to construction of the prior law. In proper cases an amendment may be viewed as a clarification of the former statute. As such it aids us in assigning meaning to the prior law. See, e.g., Larsen v. Kimble, 447 So.2d 1278, 1283 (Miss.1984); 2A Sutherland, Statutory Construction, § 49.11 (Sands ed. 1985).
This latter principle was recited in State Tax Commission v. Overstreet Investment Company, 194 So.2d 236 (Miss.1967):
The interpretation of a statute by the legislative department of the government may go far to remove doubt as to its meaning. This fact is recognized by the courts which regard it as proper, in determining the meaning of a statute, to take into consideration subsequent action of the legislature, or the interpretation which the legislature subsequently places upon the statute. There are no principles of construction which prevent the utilization by the courts of subsequent enactments or amendments as an aid in arriving at the correct meaning of a prior statute, and it is very common for a court, in construing a statute, to refer to subsequent legislation as impliedly confirming the view which the court has decided to adopt. Indeed, it has been held that if it can be gathered from a subsequent statute in pari materia what meaning the legislature attached to the *810 words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute.
Id at 238.
In construing a statute, a court may look to later acts of the legislature to ascertain the correct meaning of a prior statute. Warner v. Board of Trustees, 359 So.2d 345, 348 (Miss.1978) (citing Crosby v. Barr, 198 So.2d 571 (Miss.1967)). This principle of statutory construction is well recognized, and its sense is apparent. Construing amendments as clarifications of former statutes “removes a great deal of uncertainty in a law.” 2A Sutherland, Statutory Construction, § 49.11 (Sands ed. 1985).
The 1985 language—when compared with that available in 1984—suggests a clarification, rather than a change. We perceive no reason on principle why we ought declare the statutory language available in 1984 to have a meaning different from that specifically enacted in 1985. Cf. State ex rel. Pittman v. Ladner, 512 So.2d 1271, 1276-77 (Miss.1987). No change in policy or principle has been announced. To the point, we perceive no policy extant in 1984 but revised in 1985 conferring any rights on Riverside that ought not be disregarded. By no stretch of the imagination can it be said that the pre-1985 language conferred upon Riverside any vested right that ought be respected. Riverside holds no right vested by virtue of any contract or provision of the positive law that would be compromised or offended by reading the statute as the Commission read it in its March 21, 1985, order. See Oliphant v. Carthage Bank, 224 Miss. 386, 80 So.2d 63, 71 (1955).
There is a second aid to interpretation available which produces a similar outcome. The administrative agency which has by law been charged with interpretation and enforcement of the CON procedure has read the statute as in effect meaning that the application must refer to the state health plan in effect when the application was submitted. The agency that works with a statute frequently, if not daily, that sees it in relation to other law in the field, necessarily develops a level of insight and expertise likely beyond our ken. When such agencies speak, courts listen. See, e.g., General Motors Corp. v. State Tax Commission, 510 So.2d 498, 502 (Miss.1987); Barr v. Delta & Pine Land Co., 199 So.2d 269, 271 (Miss.1967); Gully v. Jackson International Co., 165 Miss. 103, 145 So. 905, 907 (1933); White v. Miller, 160 Miss. 734, 133 So. 146, 149 (1931). This principle has particular power where—as here—subsequent legislation incorporates the interpretation and clarification which the administrative agency has placed upon the statute. See Gully v. Jackson International Co., 165 Miss. at 113, 145 So. at 906-07; Red Lion Broadcasting Co. v. Federal Communications Commission, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).
In summary, we hold that the best reading that may be given Section 41-7-193 as it existed in 1984 is one that required that the Commission consider the applications of Grant Center and Riverside under the 1982 state health plan. The Opinion of the Chancery Court released May 23,1986, and the Order entered pursuant thereto on May 28, 1986, are vacated and reversed and the Order of the Commission entered March 21, 1985, is reinstated. This entire matter is remanded to the Chancery Court of the First Judicial District of Hinds County with instructions that it be further remanded to the Commission for further proceedings not inconsistent with this opinion.
V.
A.
Having decided the case, we note two policy concerns. Any judicial decision generates incentives to actors, though we often deny the point. If this case is set back for yet a third administrative hearing de novo, counterproductive incentives will be sent rippling through the ranks of those who participate in the administrative process. For in a very real sense what is at issue this day is whether a disgruntled *811 CON applicant can thwart its opponent not on the merits but by prolonging the litigation forever.
Riverside has sought to turn procedure into substance and has placed in peril the efficacy and the integrity of the administrative process. We intend by our action this day to send a strong signal that the administrative processes of this state, including the appellate variety thereof, should operate to facilitate desirable substantive results, not to thwart them.
B.
Before the Commission, Riverside itself sought a CON to construct a 58-bed adolescent and child psychiatric unit. Before this Court, however, Riverside takes the position that there is no longer any need for these additional beds. This new position is based upon the 1984 state health plan. The 1984 plan divided the geographic area which had been planning area C under the 1982 plan into two planning areas, planning area C and planning area F. New planning area C included only seven counties, Copiah, Hinds, Madison, Rankin, Simpson, Warren and Yazoo. The beds that had been allocated to “old” planning area C were divided between the two newly created planning areas. As a result the 1984 plan identified a need for only 24 additional child and adolescent psychiatric beds in new planning area C. The 1984 plan, like the 1982 plan, specifically provided that “[b]eds shall not be approved in excess of statistical need.”
Under the 1984, 1985 and even the 1986 State Health Plan, which expressly take into account the CON issued to Grant Center, the State as a whole is still considered to be underbedded with regard to adolescent and children psychiatric services. The record before us suggests that neither Grant Center nor Riverside projected its patient service area as being limited solely to planning area “C” or to any one planning area. The 1984 mental health service areas, to which Riverside attaches so much significance, are not iron curtains that divide the State into isolated, self-sufficient and mutually inaccessible regions. These service areas are useful geographical reference points for the allocation of health care resources. Yet their boundaries should not be slavishly or mindlessly applied to exclude health services when an established need dictates otherwise.
In pursuit of its new strategy on this appeal, Riverside has argued vigorously that issuance of a CON to Grant Center will result in significant overbedding. The argument is capsuled
If the Commission’s decision is reinstated, Riverside will not be the only loser. Someone will have to bear the costs of Grant Center’s unneeded facility, and that someone will be the residents of Mississippi and their insurers.
(Brief of Appellee, p. 10, Dec. 15, 1986). This, of course, is an argument more properly directed to the Commission; it is hardly a legal argument. Still in ordering reinstatement of the Commission’s decision, we think a comment or two might be in order, if for no other reason than to assure Riverside that we have not ignored its point.
If, upon receipt of the CON, Grant Center invests its private capital and constructs, staffs and operates an unneeded facility, we may assume that Grant Center will ultimately go broke. If Grant Center’s hospital really is unneeded, that can only mean that the residents of Mississippi will not use it. If the residents of Mississippi do not use it, we do not see how they and their insurers may be made to bear the costs.
On the other hand, it is within our judicial knowledge that Riverside has retained a virtual monopoly position when it comes to the provision of private psychiatric in-patient care in the Greater Jackson area. Grant Center, quite obviously, would provide competition in the provision of adolescent and children psychiatric care. It may be that this competition will enure to the public benefit in the form of improved services and reduced rates. It may be that in the end only one will survive — that which provides the better quality of service at the more acceptable rates. The point for the moment is that there is not a lot of punch in Riverside’s argument that our decision *812 today will merely penalize the public and the pocketbooks of its citizens and their insurers.
VI.
On September 2, 1986, Riverside filed a motion to dismiss for lack of jurisdiction. Grant Center answered and moved for attorneys fees and legal expenses on grounds that Riverside’s motion was frivolous. On September 17, 1986, the Court denied the motion to dismiss but carried with the case Grant Center’s application for sanctions. We have now considered the matter further. Though we held Riverside’s motion not well taken, we have not found it wholly frivolous. Grant Center’s motion for fees and expenses is denied.
REVERSED AND REMANDED; GRANT CENTER’S APPLICATION FOR FEES AND EXPENSES DENIED
ROY NOBLE LEE, C.J., HAWKINS, P.J., and SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
DAN M. LEE, P.J., and PRATHER, J., not participating.

. In addition, the 1984 Plan contained some inconsistencies. On page 139 of the Plan, Table 4, titled "Licensed or CON Approved Beds By Service Category, Planning Area and Facility, 1984", indicates that Grant Center is CON approved for 58 beds. This Plan also shows that in the child/adolescent psychiatric care category there were in existence or CON approvals for a total of 178 child/adolescent psychiatric beds. Page 144 of the 1984 Plan contains the following paragraph:
7. ... The present statewide statistical bed need [for child/adolescent psychiatric beds] is 280. There are presently in operation, or CON approvals for, a total of 120 child/adolescent psychiatric beds.... The state as a whole is underbedded by 160 beds. To ensure an appropriate distribution of beds, only areas presently having no licensed child/adolescent acute psychiatric beds or approvals for such beds may be considered for Certificate of Need Approval of one provider of such services. See Table 5 for statistical need computations. Beds shall not be approved in excess of statistical need.
Table 5, found on page 145 of the 1984 Plan, indicates that there was a statistical need for: 62 beds in Planning Area A; 42 beds in Planning Area B; 24 beds in Area C; 10 beds in Area D; 3 beds in Area E; and 19 beds in Area F. This comes to a total of 160 beds, or the total statewide need noted on page 144 of the 1984 Plan. The inconsistency is that while Grant Center’s 58 CON approved beds are included on one chart, they are not included in determining the total statewide bed need. If they had been, the total bed need would have been only 102 beds.

. We are told that Commission rules, in effect since October, 1982, do not allow amendments to filed CON applications. Grant Center reasons that an application can only address the state plan in effect when the application is written; hence, the 1982 plan ought control.